**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicole Wetzel, | No. CV-17-08117-PCT-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Nicole Wetzel seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for benefits under the Social Security Act (the "Act"). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure. As discussed below, the Court reverses the Commissioner's decision and remands for a determination of benefits.

## I. Procedural Background

In October 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income based on an amended disability date of June 4, 2012. (Tr. 89, 103, 119, 139.)[1] After the Social Security Administration ("SSA") denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (Tr. 87-88, 117-18.) After conducting a

---

[1] Citations to Tr. are to the certified administrative transcript of record. (Doc. 17.)

hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 20-33.) This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) *See also* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council). Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II. Administrative Record

The administrative record includes medical records and opinions pertaining to the history of diagnoses and treatment related to Plaintiff's alleged impairments including seizure disorder, bipolar disorder, depression disorder, and anxiety disorder.[2] (Tr. 22.)

### A. Medical Treatment Evidence

On June 29, 2012, Plaintiff underwent an electroencephalogram ("EEG"). (Tr. 351.) "The record was abnormal because of focal sharp and spike activity" and "polymorphic theta activity" that was "consistent, although not specific, with a seizure disorder." (*Id.*) On August 7, 2012, neurologist Elwood Hopkins, M.D., examined Plaintiff. (Tr. 359.) Plaintiff reported to Dr. Hopkins that she had a seizure when she was a child, when she delivered her second child, and sometime in 2009 when she was at work. (*Id.*) Plaintiff also reported that she hit her head in a June 2012 car accident, and since then she had been anxious and worried, and had jaw spasms with speech arrests. (*Id.*) Dr. Hopkins assessed "[p]robable partial complex seizures with EEG evidence of left temporal focus" and prescribed Lamictal. (*Id.*) He ordered an MRI of Plaintiff's brain, which was normal. (Tr. 353, 359.)

On August 17, 2012, Plaintiff had a seizure and sought treatment at the Verde Valley Medical Center ("VVMC"). (Tr. 395.) The VVMC records describe Plaintiff's seizure symptoms as generalized with loss of consciousness, and her "postictal symptom" was confusion. (*Id.*) VVMC discharged Plaintiff and advised to follow up with Dr. Hopkins. (Tr. 397.)

---

[2] The Court has considered the record and limits its discussion to the medical and opinion evidence that is relevant to Plaintiff's claims.

Plaintiff saw Dr. Hopkins on September 13, 2012. (Tr. 357.) Plaintiff reported that the night before the appointment she had a seizure that was followed by a second smaller seizure. (*Id*.) Plaintiff reported that she was tolerating Lamictal at 300 mg, but she was still having "spells." (*Id*.) Plaintiff reported that flashing lights and loud bass music triggered her "spells." (*Id*.) Dr. Hopkins noted that Plaintiff was still having muscle spasms and reported consuming a "fair amount of caffeine." (*Id*.) Plaintiff did not report any other symptoms. (*Id*.) Dr. Hopkins encouraged Plaintiff to look for work and to try to manage her anxiety and muscle spasms by reducing her caffeine intake and by treating at a "guidance center." (*Id*.)

On October 16, 2012, Plaintiff began treatment with registered nurse practitioner (RNP) Susan Albright for her anxiety and "depression issues." (Tr. 371.) Plaintiff reported that the day before the appointment she had had a seizure that caused muscle pain. (*Id*.) Plaintiff stated that she had difficulty concentrating and making decisions, she was experiencing sleep disturbances, and had a lack of social interest. (*Id*.) RNP Albright observed that Plaintiff "appeared well." (*Id*.) Her musculoskeletal, neurologic, and skin examinations were "unremarkable." (*Id*.) She appeared alert, had an appropriate affect, was oriented, had logical and relevant thoughts, good insight and judgment, clear and fluent speech, and her recent and remote memory were intact. (*Id*.) RNP Albright assessed seizure disorder and depression, and prescribed analgesics for muscle soreness and Zoloft for depression. (Tr. 371-72.) During a follow-up appointment on November 27, 2012, Plaintiff reported doing well with Zoloft. (Tr. 370.) RNP Albright observed that Plaintiff was alert and oriented. (*Id*.)

On November 29, 2012, Plaintiff presented to VVMC after having a seizure. (Tr. 384.) Plaintiff complained of a headache, muscle soreness, and weakness on her right side. (*Id*.) At one point, Plaintiff was noted to be "in some form of generalized body action" and her hands were clenched. (Tr. 386.) Plaintiff was given Ativan and went to sleep. (*Id*.) Sometime later, after doctors took Plaintiff's medical history and conducted a physical examination, she had another episode that was also treated with

Ativan. (*Id*.) Treatment providers at VVMC diagnosed Plaintiff with a seizure disorder and discharged her after her condition improved. (Tr. 388-89.)

On March 13, 2013, Plaintiff saw Dr. Hopkins and reported having seizures about twice a week. (Tr. 414.) Dr. Hopkins noted that the seizures were not well controlled, and increased Plaintiff's dose of Lamotrigine to 300 mg at night and 150 mg in the morning. (*Id*.) During a May 30, 2013 follow-up appointment, Plaintiff's mother reported that Plaintiff continued to have seizures, usually every three to six days. (Tr. 412.) The seizures lasted for up to ten minutes. (*Id*.) Plaintiff reported that Naproxen was not helping the muscle pains that followed her seizures. (*Id*.) Dr. Hopkins noted that the seizures were not responsive to Lamotrigine and that he had to consider non-epileptic seizures. (*Id*.) He prescribed Tegretol, with a taper of Lamotrigine when Plaintiff reached therapeutic levels, and Robaxin for muscle spasms. (*Id*.) He recommended that Plaintiff undergo a video EEG. (*Id*.) On November 14, 2013, Plaintiff reported seizures once a week, usually in the late afternoon. (Tr. 437.) Plaintiff stated that she was tolerating Tegretol. (*Id*.) Dr. Hopkins noted that Plaintiff's seizures were poorly controlled and modified her medications. (*Id*.)

On December 5, 2013, Plaintiffs saw RNP Albright and reported that her last seizure was five days before the appointment. (Tr. 447.) Plaintiff stated that she stayed at home because she was afraid of having seizures in public. (*Id*.) She reported staying in bed as long as possible in the morning and having no energy. (*Id*.) RNP Albright discontinued Zoloft due to ineffectiveness and prescribed Wellbutrin. (*Id*.)

On January 23, 2014, Plaintiff saw Dr. Hopkins and reported that she was doing "a bit better." (Tr. 435.) She stated that she had a seizure in November 2013, a partial seizure sometime in December 2013, a seizure during her sleep on December 11, 2013, a seizure on December 26, 2013, and a seizure on January 4, 2014. (*Id*.) Plaintiff reported taking Wellbutrin 300 mg and stated that she felt off balance and "weird" on the higher dose of Tegretol. (*Id*.) Dr. Hopkins examined Plaintiff and reported that she had "mild dysmetria and ataxia." (*Id*.) Dr. Hopkins noted that Welbutrin, at the dosage Plaintiff

reported taking, could cause seizures. (*Id.*) He added Topomax to Plaintiff's medications. (*Id.*) On January 27, 2014, Plaintiff saw RNP Albright to change her medications. (Tr. 446.) RNP Albright discontinued Wellbutrin and prescribed Venlafaxine. (*Id.*)

Between February 19 and 26, 2014, Plaintiff was monitored for epilepsy at Barrow Neurological Institute. (Tr. 498-03.) She did not have any events on days one, three, or five of the monitoring. (Tr. 500-01.) On day two, hyperventilation "produced slowing of the background" and "photic stimulation produced driving at various flash frequencies." (Tr. 500.) On days six and seven, hyperventilation "produced slowing of the background," but "photic stimulation did not produce driving." (Tr. 501.) On day four, a clinical event was documented. (*Id.*) During the event, Plaintiff was resting in bed and had "irregular twitching movements" and was "poorly responsive." (Tr. 502.) Her eyes were closed, she had "some rigidity with irregular twitching," she had trouble following commands, but she was able to say "I don't know" when asked what was happening. (*Id.*) The impression was that this was a non-epileptic event. (*Id.*) Plaintiff's discharge summary stated that the generalized slowing of background suggested a generalized encephalopathic process, "that could be in part due to pharmacological treatment or sleep deprivation." (Tr. 502.) "On intellectual testing [Plaintiff] demonstrated low average verbal comprehension abilities and average perceptual reasoning abilities." (Tr. 502-03.) Plaintiff's memory performance varied from "low average to moderately impaired recall with both verbal and visual information." (*Id.* at 503.)

On February 28, 2014, Plaintiff returned to RNP Albright complaining of feeling tired and sluggish. (Tr. 445.) RNP Albright increased Plaintiff's prescription for Venlafaxine. (*Id.*) On March 27, 2014, at an appointment with Dr. Hopkins, Plaintiff reported that she was doing much better on her current treatment regimen. (Tr. 433.) Plaintiff reported a few out-of-body experiences, and Dr. Hopkins noted that Plaintiff's seizures were likely non-epileptic. (*Id.*) He diagnosed dissociative fugue and continued Plaintiff's medications. (*Id.*)

Plaintiff had another appointment with RNP Albright on March 28, 2014. (Tr. 444.) Plaintiff reported that her last seizure occurred in mid-February. (*Id*.). However, she complained of episodes when she would zone out and was forgetful. (*Id*.) Plaintiff reported frequent frustration with losing things and finding them in places where she did not remember putting them. (*Id*.)

On June 26, 2014, Plaintiff had an appointment with Dr. Hopkins and reported that she was still having seizures. (Tr. 430.) Plaintiff stated that she would feel weird and hear strange sounds in her head. (*Id*.) Dr. Hopkins noted that Plaintiff looked well, with no sign of depression. (*Id*.) He began to wean Plaintiff off Tegretol. (*Id*.)

On July 20, 2015, Plaintiff had an appointment with neurologist David Llewellyn, M.D. (Tr. 465.) Plaintiff reported that she would sometimes wake up having seizures. (*Id*.) Plaintiff's mother reported that she noticed Plaintiff would turn her head and clench her fists for about five minutes, during which time she was unresponsive. (*Id*.) Plaintiff reported occasional headaches and muscle cramps. (*Id*.) Dr. Llewellyn reported that, on examination, Plaintiff was awake and alert, had normal attention and concentration, a normal fund of knowledge, was oriented, had intact recent and remote recall, and had "normal language." (*Id*.) Additionally, he reported that Plaintiff had mildly decreased sensation in the distal lower extremities and a mild reduction in deep tendon reflexes in her feet. (Tr. 466.) Dr. Llewellyn diagnosed "dissociative convulsions" and increased Topiramate to 75 mg pending a review of the last EEG report. (*Id*.)

**B.    Opinion Evidence**

**1.    RNP Albright**

In 2012 and 2014, RNP Albright completed mental capacity assessments of Plaintiff. (Tr. 374-76, 425-27.) On November 28, 2012, RNP Albright conducted an assessment and opined that Plaintiff had no limitations in her abilities to interact appropriately with the general public, ask simple questions, get along with co-workers, and to maintain socially appropriate behavior. (Tr. 375.) She opined that Plaintiff had moderate limitations in her abilities to carryout short and simple instructions, make

simple work-related decisions, and respond appropriately to changes in the work setting. (Tr. 375-76.) She found that Plaintiff had marked limitations in her abilities to (1) understand, remember, and carry out simple instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) perform activities within a schedule, (5) maintain attendance, (6) sustain a routine without special supervision, (7) work in coordination with others without being distracted by them, (8) perform at a consistent pace, and (9) accept instructions and respond appropriately to criticism from supervisors. (Tr. 374-76.) She also found that Plaintiff had extreme limitations in her abilities to (1) understand and remember detailed instructions, (2) complete a normal workday and workweek without interruptions, (3) travel in unfamiliar places, and (4) set realistic goals. (Tr. 374-76.) RNP Alright also opined that Plaintiff would miss work more than four days per month. (Tr. 375.)

On March 28, 2014, RNP Albright completed a second mental capacity assessment. (Tr. 425-27.) She opined that Plaintiff had no limitations in her abilities to ask simple questions. (Tr. 426.) Plaintiff had slight limitations in her abilities to accept instructions and respond appropriately to criticism from others, get along with co-workers or peers, and maintain socially appropriately behavior. (*Id*.) She found that Plaintiff had moderate limitations in her abilities to perform activities within a schedule and maintain attendance, work in coordination with others without distraction, and interact with the public. (Tr. 425-26.) Plaintiff had marked limitations in her abilities to (1) understand, remember, and carry out simple instructions, (2) sustain a routine without special supervision, (3) perform at a consistent pace, (4) make simple work-related decisions, and (5) interact appropriately with the general public. (*Id*.) Plaintiff had extreme limitations in her abilities to (1) understand, remember, and carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) complete a normal workday and workweek, (4) respond to changes in a work setting, (5) travel in unfamiliar places, and (6) set realistic goals. (Tr. 425-27.) RNP Albright opined Plaintiff would miss work more than four times per month. (Tr. 426.)

### 2. Colin R. Joseph, Ph.D.

In January and November 2013, Dr. Collin Joseph conducted disability evaluations on referral from the Arizona Department of Economic Security, Social Security Disability Determination Office. (Tr. 398-401, 419-22.) Dr. Joseph's January 10, 2013 evaluation notes that "there were no medical or mental health records available to review." (Tr. 398.) Dr. Joseph interviewed Plaintiff about her medical history, conducted a mental status examination, and made behavioral observations before stating his "diagnostic impression" and providing a medical source statement. (Tr. 398-401.)

Plaintiff reported to Dr. Joseph that she dropped out of school in eleventh grade because she felt uncomfortable in social environments. (*Id*.) Plaintiff also reported that she was uncomfortable in public places and that she could not go to the grocery store alone due to anxiety about having a seizure. (*Id*.) Plaintiff described herself as irritable and impatient with people and easily frustrated. (*Id*.) Plaintiff had ongoing low energy, low motivation, variable appetite, and forgetfulness. (Tr. 399.) Plaintiff stated that her mother kept track of her appointments, reminded her to take her medication, and reminded her to pick up her daughters from the bus stop. (*Id*.)

Plaintiff scored a 30/30 on the mental status examination. (Tr. 400.) Dr. Joseph observed that Plaintiff had a mildly flattened affect and appeared nervous, with a somewhat depressed mood. (Tr. 398, 400.) Dr. Joseph found Plaintiff's depression moderate in severity. (*Id*.) Dr. Joseph found Plaintiff's description of her symptoms consistent with bipolar disorder. (*Id*.) He stated that while Plaintiff did not exhibit any impairment in memory function, her mood instability would interfere with her cognitive functioning. (*Id*.) Dr. Joseph opined Plaintiff would likely need repetition of instructions to learn detailed tasks, her ability to maintain attention and concentration on work-related tasks would be "effortful," and she would likely respond to criticism with anxiety, irritability, or anger. (*Id*.) He also found that Plaintiff was prone to excessive absenteeism and fleeing the work environment. (*Id*.)

Dr. Joseph conducted another disability evaluation on November 5, 2013. (Tr. 418-22.) Unlike the January 2013 evaluation, the November 5, 2013 evaluation does not indicate that there was an absence of medical or mental health records available to review, and instead mentions Plaintiff's medical treatment. (*Compare* Tr. 398 *with* Tr. 418-19.) Dr. Joseph interviewed Plaintiff about her medical history, conducted a mental status examination, and made behavioral observations before stating his "diagnostic impression" and providing a medical source statement. (Tr. 418-21.)

In the second evaluation, Plaintiff reported to Dr. Joseph that she would not go out in public alone and that she had isolated herself from her friends. (Tr. 419.) Plaintiff stated that she occasionally went to the store with her mother, but she always felt like people were judging her. (*Id*.) Plaintiff complained of depression with intermittent episodes of increased energy and reduced need for sleep. (*Id*.) Plaintiff reported that her ability to concentrate was diminishing and that she could not concentrate long enough to help her daughter with math homework. (*Id*.) Plaintiff reported that mother reminded her to take her medications. (Tr. 419-20.)

Dr. Joseph observed that Plaintiff had a moderately flattened affect, appeared worried and lethargic, and became tearful when talking about her future. (*Id*.) Plaintiff's speech was somewhat slowed and monotone, and she seemed emotionally vulnerable. (Tr. 421.) Plaintiff scored a 28/30 on the mental status exam, which Dr. Joseph found suggestive of difficulty with concentration and attention. (*Id*.) Dr. Joseph noted that Plaintiff did not identify the correct day of the week, could not perform serial sevens correctly, and spelled world backwards "quite slowly." (*Id*.) Dr. Joseph diagnosed bipolar disorder. (*Id*.) Dr. Joseph opined that Plaintiff's cognitive processes would be interrupted in a social or performance setting, she would need repeated instructions to learn detailed tasks, maintaining attention and concentration on work-related tasks would be "effortful," and she would be prone to excessive absenteeism and fleeing work. (Tr. 422.) Dr. Joseph further found that Plaintiff would be prone to panic attacks in a typical work environment. (*Id*.)

### III.     The Administrative Hearing

Plaintiff was twenty-eight years old at the disability onset date. (Tr. 31.) She had a high school equivalency education. (Tr. 49.) Plaintiff had past relevant work as a cashier and an assistant manager. (Tr. 51, 80-81.) At the administrative hearing, Plaintiff testified she took care of her daughters by getting them up in the morning, helping them with homework, and doing their laundry. (Tr. 55.) Plaintiff testified that she lived with her parents and that her mom did most of the cooking, but she helped. (Tr. 53, 55.) Plaintiff went shopping at "smaller" stores with her mom. (*Id*.) Plaintiff's mom accompanied her to her daughters' activities. (*Id*.)

Plaintiff testified that she had previously volunteered at a food bank and that she volunteered for Narcotics Anonymous ("NA") by running two hour-long meetings during the week. (*Id*. at 61-63.) Plaintiff testified that a friend was trying to help her with her anxiety by taking her to the store and other places to socialize. (Tr. 65.) Plaintiff testified that she went to one NA "dance event" and it was "very nerve-racking." (Tr. 68.)

The vocational expert testified that someone of Plaintiff's age, education, and work experience, and with the residual functional capacity ("RFC") the ALJ assessed, could not perform Plaintiff's past relevant work, but could perform the jobs of housekeeper and router. (Tr. 25, 81.) The vocational expert testified that if such an individual needed extra breaks twice per week, there would be no work available for that individual. (Tr. 82.) The vocational expert also testified that missing more than two days of work per month would preclude work. (Tr. 82-83.) The vocational expert testified that there would be no work for an individual with the limitations that Dr. Joseph identified, which were translated into being off task ten percent of the work day. (Tr. 83-84.)

### IV.     The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).  To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.    20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d).   If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e).   At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.    20 C.F.R. §§ 404.1520(g), 416.920(g).  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 22.)  At step two, the ALJ found that Plaintiff had the following severe impairments:

"status post: motor vehicle accident with seizure disorder; bipolar disorder; depression disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c))." (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (Tr. 24.)

The ALJ found that Plaintiff had the RFC "to perform a full range of work at all exertional levels." (Tr. 25.) The ALJ clarified that Plaintiff was "limited to occasionally balancing as well as never climbing ladders, ropes, or scaffolds." (*Id.*) The ALJ further found that Plaintiff "must avoid moderate exposure to hazards, including unprotected heights and moving machinery" and could not "perform primarily driving jobs." (Tr. 26.) Plaintiff could "understand, remember, and carry out simple instructions and perform simple routine repetitive tasks." (*Id.*) She "could occasionally interact with the public, co-workers, and supervisors with that supervision being occasional, direct and concrete, but no contact with crowds." (*Id.*)

The ALJ concluded that Plaintiff could not perform her past relevant work. (Tr. 31.) The ALJ further concluded that considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other work that existed in significant numbers in the national economy. (*Id.*) Therefore, the ALJ concluded that Plaintiff had not been under a disability as defined in the Act from June 4, 2012 through the date of the ALJ's decision. (Tr. 32.) The ALJ denied Plaintiff's applications for disability and disability insurance benefits and for supplemental security income. (*Id.*)

## V.     Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even if the

ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

## VI.   Plaintiff's Claims

Plaintiff raises the following claims: (1) the ALJ erred by assigning little weight to the opinions of examining physician Dr. Joseph and RNP Albright (Doc. 18 at 14-21), and (2) the ALJ erred by failing to provide clear and convincing reasons for rejecting Plaintiff's symptom testimony. (*Id*. at 22-25.) The Commissioner asserts that the ALJ's decision is free from harmful error and is supported by substantial evidence. (Doc. 19.) As set forth below, the Court concludes that the ALJ erred by rejecting Dr. Joseph's opinions and Plaintiff's subjective complaints.

### A.   Weighing Medical Source Opinions

In her first claim, Plaintiff argues that the ALJ erred in assigning little weight to two medical source opinions. In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians or treating sources: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not

treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id*. The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining medical source by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). In addition to considering the medical opinions of physicians, an ALJ must consider the opinions of medical providers who are not considered "acceptable medical sources." *See* 20 C.F.R. § 404.1527(b), (f) (evaluating opinion evidence for claims filed before March 27, 2017). An ALJ may give less deference to "other sources," but must provide reasons germane to each witness for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

When evaluating medical opinion evidence, the ALJ may consider the length and nature of the treating relationship, frequency of examination, "the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631; *see Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (stating that the same factors are used to evaluate the opinions of acceptable medical sources and "the opinions of those who are not.").

**B. Weight Assigned Dr. Joseph's Opinions**

Plaintiff does not dispute that Dr. Joseph's opinions were contradicted by the opinions of the non-examining physicians. (Doc. 18 at 17-18; Tr. 28 (discussing opinions of state agency medical consultants and finding Plaintiff more limited than determined by those consultants) (citing Admin. Hrg. Exs. 3A and 4A)).) Therefore, the ALJ was required to provide "specific and legitimate reasons . . . supported by substantial evidence in the record" for rejecting the opinions of examining physician Dr. Joseph. *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

The ALJ assigned "partial weight" to the 2013 opinions of examining physician Dr. Joseph. (Tr. 28.) The ALJ stated that he gave Dr. Joseph's opinions partial weight because they were inconsistent with "the totality of the medical evidence," the results of the mental status examination (MSE), and were based primarily on "the complaints and behavior of [Plaintiff] during the examination."[3] (*Id.*)

**1. Inconsistent with the Medical Record**

The ALJ rejected Dr. Joseph's 2013 opinions because he believed that "the limitations imposed on [Plaintiff]" were "inconsistent with the totality of the medical evidence." (Tr. 28.) The ALJ generally referred to the limitations Dr. Joseph assessed, but did not cite to the medical evidence that established a conflict between any particular limitation and the medical record.[4] (*Id.*) The ALJ's conclusory assertion that the

---

[3] In his January 2013 disability evaluation, Dr. Joseph noted that "there were no medical or mental health records available to review." (Tr. 398.) The regulations state that when the agency arranges for a consultative examination, it will "give the examiner any necessary background information about your condition." 20 C.F.R. § 416.917. The Commissioner notes that Dr. Joseph did not have medical records to review in January 2013, but does not argue that the opinion should be discounted on that basis (Doc. 19 at 8), and the Court would not consider that rationale because the ALJ did not assert it to support his rejection of Dr. Joseph's opinion. (Tr. 28); *see Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (stating that the court's review is limited to "reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.").

[4] The ALJ noted that Dr. Joseph opined that Plaintiff would have limitations including "additional repetition of instructions to learn new detailed tasks," limitations maintaining attention and concentration on work-related tasks, limitations in responding to feedback from supervisors, excessive absenteeism, and panic attacks in the work setting. (Tr. 28 (citing Admin. Hrg. Ex. 11F at 5-6).) The ALJ further noted that Dr. Joseph opined that Plaintiff "would be slow to respond to normal workplace hazards." (Tr. 28.)

limitations Dr. Joseph assessed were inconsistent with the medical evidence does not satisfy the standard required for rejecting an examining physician's opinion. *See* 20 C.F.R. §§ 404.1527, 416.927; *Reddick*, 157 F.3d at 725 (explaining that an ALJ provides "specific and legitimate reasons for rejecting a contradicted opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."); *Swanson v. Sec'y of Health and Human Servs*, 763 F.2d 1061, 1065 (9th Cir. 1985) (same). The ALJ must do more than offer his conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006). The ALJ did not satisfy this burden in concluding, without explanation, that Dr. Joseph's opinion was "inconsistent with the totality of the medical evidence." (Tr. 28.)

## 2. Based on Subjective Complaints and Behavior

The ALJ also rejected Dr. Joseph's opinions because the ALJ concluded that they were primarily based on Plaintiff's subjective complaints and her behavior during the examinations. (Tr. 28.) As Plaintiff argues, this is not a specific and legitimate reason for discounting Dr. Joseph's opinions.

Generally, "[a] physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotation marks and citation omitted). However, the Ninth Circuit has concluded that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). In *Buck*, the Ninth Circuit explained that "[p]sychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient." *Id*. Therefore, an ALJ does not provide legally sufficient reasons for rejecting

an examining physician's opinion by questioning the credibility of the patient's complaints when "the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008) (citing *Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001)); *see Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999) (stating that if the examining psychologist did not find that the claimant was malingering or being deceptive, the ALJ cannot reject the opinion because it is based, in part, on the claimant's complaints).

In January and November 2013, Dr. Joseph examined Plaintiff, who was accompanied by her mother at both appointments. (Tr. 398, 418.) During the January 2013 examination, Dr. Joseph found that Plaintiff "appeared to give an honest effort to provide relevant information" and that "there was no evidence of malingering or inconsistency." (Tr. 400, 420.) Because Dr. Joseph specifically stated that he found no evidence of malingering or inconsistency, the ALJ erred in rejecting Dr. Joseph's opinions of Plaintiff's mental capacity based on the ALJ's conclusion that those opinions were based on Plaintiff's subjective complaints. (Tr. 400, 420); *see Ferrando v. Comm'r of Soc. Sec. Admin.*, 449 F. App'x. 610, 612 n.2 (9th Cir. 2011) (stating that allowing an "ALJ to discredit a mental health professional's opinion solely because it is based to a significant degree on a patient's 'subjective allegations' is to allow an end-run around our rules for evaluating medical opinions for the entire category of psychological disorders."). Therefore, the ALJ did not provide specific and legitimate reasons for rejecting Dr. Joseph's opinions of Plaintiff's mental capacity.[5]

### C. Weight Assigned RNP Albright's Opinions

Under the applicable regulations, RNP Albright, a registered nurse practitioner, is considered an "other source," as opposed to an "acceptable medical source." *See* 20

---

[5] Plaintiff does not challenge the ALJ's third reason for rejecting Dr. Joseph's opinion—that it was inconsistent with the results of the MSE. (Doc. 18.) The ALJ noted that Plaintiff scored an average of 29/30 on an MSE. (Tr. 28 (citing Admin. Hrg. Ex. 11F at 4, Ex. 7F at 3).) The Commissioner defends this rationale, but does not explain why the results of the MSE are inconsistent with any particular limitation that Dr. Joseph assessed.

C.F.R. § 416.927(f) (discussing medical opinions from sources who are not acceptable medical sources for claims filed before March 20, 2017). The ALJ may reject the opinions of "other sources" by giving "reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010). The ALJ discounted RNP Albrights's opinions because he found them inconsistent with the medical evidence, inconsistent with each other, and because she gave no explanation for the changes between her 2012 and 2014 opinions. (Tr. 29.) The ALJ discounted RNP Albright's opinion that Plaintiff was disabled as an issue reserved to the Commissioner, and Plaintiff does not challenge that aspect of the ALJ's decision. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (stating that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner.").

### 1.    Inconsistent with the Medical Record

The ALJ rejected RNP Albright's opinions because he believed that they were "inconsistent with the totality of the medical evidence." (Tr. 29.) As previously noted, an ALJ may discount the opinion of an "other source," if he provides a reason "germane to [the] witness for doing so." *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (internal quotation marks omitted); *see* 20 C.F.R. § 416.913 (2013). An inconsistency between the "other source" opinion and other parts of the record may constitute a "germane" reason. However, an ALJ does not provide a "germane" reason for rejecting an "other source" opinion when the ALJ inadequately explains the basis for the inconsistency. *See Revels v. Berryhill*, 874 F.3d 648, 665-66, 668 (9th Cir. 2017); *Popa*, 872 F.3d at 907 (stating that the ALJ's conclusion that a nurse practitioner's opinion conflicted with other medical evidence was not a germane reasons for discounting her opinion when the ALJ did not sufficiently explain the inconsistency).

Here, the ALJ generally referred to RNP Albright's opinions, but did not cite to the medical evidence that established a conflict between any particular limitation

contained in her opinions and the medical record. (Tr. 29.) Thus, the ALJ failed to explain the basis for the alleged inconsistency and therefore did not provide a germane reason for discounting RNP Albright's opinion. *See Revels*, 874 F.3d at 665-66 (concluding that the ALJ failed to demonstrate an inconsistency between a physical therapist's opinion and the record and, therefore, an alleged inconsistency was not a germane for discounting the physical therapist's opinion).

### 2.    Inconsistency between Opinions

The ALJ also discounted RNP Albright's opinions because they were inconsistent with each other and because she did not explain the differences between her 2012 and 2014 opinions. (Tr. 29.) For example, the ALJ noted that in 2012 RNP Albright opined that Plaintiff had "almost no limitation in social interaction," and in 2014 she opined that Plaintiff would have "slight limitations in this area." (*Id*.)

The Commissioner further explains that in 2012, RNP Albright found that Plaintiff had *no limitations* in four areas of social interaction (the ability to interact appropriate with the general public, to ask simple questions or request assistance, to get along with peers and co-workers without distraction, and to maintain socially appropriate behavior) and a *marked limitations* in accepting instructions and responding appropriate to criticism from supervisors. (Doc. 19 at 6, Tr. 375.) Then, in March 2014, RNP Albright found *slight limitations* in three areas of social functioning (the ability to accept instructions or respond appropriately to criticism from supervisors, the ability to get along with peers and co-workers without distraction, and the ability to maintain socially appropriately behavior) and a *moderate* limitation in her ability to interact with the general public. (Doc. 19 at 6; Tr. 426.)

Upon review of the 2012 and 2014 opinions, the Court has found other differences between the opinions that are unexplained. (*Compare* Tr. 375-76 *with* Tr. 425-26.) The 2014 opinion generally reflects that Plaintiff's mental abilities were more limited, but sometimes indicates that Plaintiff's mental limitations were less limited than in 2012 (*Id*.)

Plaintiff states that medical evidence in the record, including Dr. Joseph's evaluation and Dr. Hopkins' March 2014 diagnosis of a "dissociative fugue", supports the changes in RNP Albright's 2014 opinion. (Doc. 18 at 18-19.) She asserts that the record indicates that Plaintiff's condition declined and, thus, explains the changes in RNP Albright's opinions. (*Id*.) However, there is no indication that RNP Albright considered this evidence in reaching her opinions. (Tr. 375-76, 425-26.) Additionally, an alleged decline in Plaintiff's condition does not explain findings in the 2014 mental capacity assessment that indicate that Plaintiff's mental abilities were less limited than noted in the 2012 mental capacity assessment.

The Court concludes that RNP Albright's unexplained changes between her 2012 and 2014 opinions, which resulted in inconsistencies between those opinions, was a germane reason for the ALJ to discount her opinions. *See Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (concluding that inconsistency in a doctor's own opinions was a specific and legitimate reason for discounting the opinions). Because the Court concludes that the ALJ provided one germane reason for discounting RNP Albright's opinions of Plaintiff's functional mental abilities, the ALJ properly discounted RNP Albright's opinions. *See Lewis,* 236 F.3d at 511.

### D.      Plaintiff's Subjective Complaints

Plaintiff asserts that the ALJ erred by failing to provide clear and convincing reasons for discounting her subjective complaints. (Doc. 18 at 22-25.) The Commissioner defends the ALJ's assessment of Plaintiff's symptom testimony. (Doc. 19 at 10-14.) As discussed below, the Court finds that the ALJ erred by rejecting Plaintiff's symptom testimony without providing clear and convincing reasons for doing so.

An ALJ uses a two-step analysis to evaluate a claimant's subjective symptom testimony. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"

*Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms limit the claimant's ability to work.[6] *See* 20 C.F.R. § 404.1529(c)(1). At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for discounting the symptom testimony. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*,

---

[6] In 2016, after the ALJ issued his 2015 decision in this case, the Social Security Administration issued Social Security Ruling 16-3p, 2016 WL 1119029 (March 16, 2016) (SSR 16-3p) (effective March 16, 2016), which provides new guidance for ALJs when evaluating a disability claimant's statements regarding the intensity, persistence, and limiting effects of symptoms. SSR 16-3p replaces Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996) (SSR 96-7p). SSR 16-3p eliminates the term "credibility" used in SSR 96-7p to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at *1. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character," but "obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

The methodology required by SSR 16-3P and SSR 96-7p are similar. Under either ruling, the ALJ is required to consider the claimant's report of her symptoms against the record; in SSR 96-7p, this resulted in a "credibility" analysis, in SSR 16-3, this allows the adjudicator to evaluate "consistency."

504 F.3d at 1036).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting her symptom testimony.  (Doc. 16 at 24.)  As set forth below, the Court concludes that the ALJ erred by discounting this testimony.[7]

As noted in the ALJ's decision, when she applied for disability, Plaintiff reported that she was unable to work due to epilepsy, recurring seizures, anxiety, and depression.  (Tr. 26 (citing Admin. Hrg. Ex.2E at 2).)  Plaintiff later reported that her social anxiety had worsened and that her epilepsy had not improved.  (Tr. 26 (citing Admin. Hrg. Ex. 4E at 2).)  Plaintiff stated that she had limitations in walking, sitting, kneeling, stair climbing, memory, concentration, following instructions, and using her hands.  (Tr. 26 (citing Admin. Hrg. Ex. 6E at 6).)  Plaintiff explained that she could follow written instructions, but could not follow spoken instructions.  (Tr. 26.)  The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found that her "statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible . . . ."  (*Id.*)  As discussed below, the ALJ gave several reasons for rejecting Plaintiff's symptom testimony.  (Tr. 26-27.)

### 1.    Plaintiff's Work History

The ALJ stated that he considered Plaintiff's work history in assessing the credibility of her symptoms.  (Tr. 30.)  The ALJ concluded that Plaintiff's "relatively low and inconsistent earnings prior to the alleged onset date" indicated a "lack of motivation," which undermined Plaintiff's credibility.  (*Id.*)  Plaintiff disputes the ALJ's conclusion and asserts that she worked for most of her adult life before she applied for disability benefits.  (Doc. 18 at 23.)

---

[7]  The Commissioner objects to the clear and convincing standard, but recognizes that the Ninth Circuit continues to apply this standard.  (Doc. 19 at 11 n.3.)

Plaintiff states that she first worked in 1999-2000, when she was sixteen or seventeen years old. (*Id*.) She started working again in 2004, when she was twenty-one years old. (*Id*.) Plaintiff agrees that her earnings records do not show any earnings for 2006, but states that during that year she moved back to Arizona from Pennsylvania where she had previously worked at a Giant Food Store. (Doc. 18 at 23; Tr. 52, 236-37.) Starting in 2007, Plaintiff worked at Family Dollar "until she became disabled." (Doc. 18 at 23.) The record reflects that, with the exception of 2006, Plaintiff worked regularly once she started working at the age of twenty-one in 2004. (Tr. 236-37.) The lack of record earnings during one year does not support the conclusion that Plaintiff had a poor work history that indicated a lack of motivation to work. *But see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (poor work history, including gaps of several years between jobs, showed little propensity to work); *Brown v. Comm'r of Soc. Sec.*, 2011 WL 5117911, at *6 (D. Or. Oct. 26, 2011) (work history that included several years during which claimant had no earnings was inconsistent with allegation that claimant was unable to work due to alleged impairments).

### 2.     Activities of Daily Living

An ALJ may reject a claimant's symptom testimony if the severity of the alleged symptoms is incompatible with the claimant's daily activities. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Daily activities may also be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

The ALJ found that Plaintiff's reported limitations in walking, memory, concentration, following instructions, and using her hands were inconsistent with her abilities to get her two minor children up in the mornings, help her children with homework, do laundry, help with chores (doing dishes and sweeping), and walk her dog. (Tr. 30.) As Plaintiff argues, the ALJ did not properly rely on these daily activities to

support his credibility determination. (Doc. 18 at 23-24.) Plaintiff's daily activities are not a clear and convincing reason supported by substantial evidence for discrediting Plaintiff's symptom testimony.

The ALJ did not make any finding addressing how often Plaintiff engaged in these activities or whether these activities were transferrable to a work setting. (*Id*.) Additionally, the ALJ did not explain why the cited daily activities were inconsistent with the severity of Plaintiff's reported symptoms. Accordingly, Plaintiff's daily activities were not a legally insufficient reason for discounting her symptom testimony, and the ALJ erred by discounting Plaintiff's symptom testimony on the basis of her daily activities. *See Trevizo v. Berryhill,* 871 F.3d 664, 682 (9th Cir. 2017) (finding that ALJ erred by relying on claimant's childcare activities to discount the severity of claimant's symptoms when there were no details regarding those activities).

### 3. Inconsistent Statements related to Social Phobia and Drug Use

The ALJ also noted that Plaintiff had reported that she had a social phobia and could not go places alone. (Tr. 30; Tr. 281 (reporting social anxiety), Tr 284 (reporting that she could not go out in public alone).) The ALJ discounted this symptom testimony because he found it inconsistent with Plaintiff's testimony that she attended school and registration meetings for her children, occasionally shopped with her family, used a cell phone, went for walks, attended church three times a month, had a significant other she met in a social setting, volunteered with NA, and ran NA meetings three times a month. (Tr. 30.) The ALJ also noted that Plaintiff had an NA sponsor, was a NA sponsor, attended a NA party in 2014, and went on river trips with friends. (Tr. 30.)

Plaintiff does not dispute that she engaged in these activities. (Doc. 18 at 24.) However, she correctly notes that her use of a cell phone is not inconsistent with her report that she cannot go out alone. Additionally, she did not participate in the listed activities alone. Rather, Plaintiff's mother went with her to school meetings and the store. (Tr. 54-55.) Plaintiff testified that she went on walks with her daughters, including dog walks. (Tr. 56, 61.) Plaintiff also testified that she went to church with her family.

(Tr. 61 (testifying that "we go [to church] like three times a month.").) Plaintiff also explained that she had been involved in NA for two years, and that "[f]our or five people" attended the NA meetings, that she was "comfortable around" the people in her group, and that her NA sponsor (who she has known since she was "a little girl") attended meetings with her. (Tr. 64, 76-78.) Plaintiff also had a significant other with whom she attended NA meetings. (Tr. 66, 69.) Plaintiff testified that she had three friends who helped her with transportation. (Tr. 56, 65.) Plaintiff stated that she socialized with those friends by going to the river, or hiking in the summer, or going out to eat. (Tr. 65.)

Plaintiff's ability to go out to dinner or participate in other activities with friends or family is not inconsistent with her reported social phobia. Thus, the ALJ's conclusion that Plaintiff made inconsistent statements regarding her social phobia is not supported by substantial evidence in the record and, thus, is not a sufficient reason for discounting her testimony about her social phobia.

The ALJ also discounted Plaintiff's credibility because he found that she was not truthful about her drug use. (Tr. 30.) The ALJ noted that Plaintiff testified at the 2015 administrative hearing that she had been clean for over three years, but she had a 2013 drug conviction. (Tr. 30, 59 (Plaintiff's testifying that she had not "had drugs in her system for probably four years.").) As Plaintiff notes (Doc. 18 at 24), the record reflects that the charges against Petitioner were based on activity in 2012, three years before the hearing. (Tr. 242.) Thus, Plaintiff's statement about her drug use was not inconsistent with the record.

## VII.    Conclusion and Remedy

As set forth above, the Court concludes that the ALJ erred by rejecting the opinion of Dr. Joseph and by rejecting Plaintiff's symptom testimony. Thus, the Court reverses the Commissioner's decision and has the discretion to remand the case for further development of the record or for an award benefits. *See Reddick*, 157 F.3d at 728. Under the Ninth Circuit's credit-as-true standard, courts may credit as true improperly rejected

medical opinions or claimant testimony and remand for an award of benefits if each of the following are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citing *Ryan*, 528 F.3d at 1202). If the "credit-as-true rule" is satisfied, the court may remand for further proceedings, instead of for an award of benefits, "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021.

Here, the Court finds that the record has been fully developed and further administrative proceedings would serve no useful purpose. Further, as detailed above, the Court finds that the ALJ has failed to provide legally sufficient reasons for rejecting Dr. Joseph's opinions and Plaintiff's symptom testimony. Finally, according to the vocational expert's testimony, if Dr. Joseph's opinions were credited as true, Plaintiff would be disabled under the Act. (Tr. 83 (citing Admin. Hrg. Exs. 7F and 11F).) Review of the record does not create serious doubt as to whether Plaintiff is disabled under the Act. *See Garrison*, 759 F.3d at 1021.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying benefits is **REVERSED** and this matter is remanded for a determination of benefits.

Dated this 8th day of June, 2018.


_____
Bridget S. Bade
United States Magistrate Judge